The approval of the railroad commission was a matter of necessity, in order·to enable the defendant to use the device permanently.   Both parties understood this necessity.   The requirement in the contract was, therefore, not limited to the satisfactory operation of the plant antecedent to payment; but the acceptance of the commission was also made a prerequisite.   The approval was not to be secured by the defendant.   If the plaintiff expected payment, it must secure the sanction of this body.   The defendant was not called upon to take the initiative.   There is no intimation in the complaint, and no evidence, that the approval was unreasonably withheld, or that there was any collusion between the defendant and the official body charged with the inspection and approval of the plant.   There is no evidence that the plaintiff was urging action by the commission during this long period. The defendant from time to time was sending·reports setting forth "the daily condition of the apparatus and machinery of said device," and in the meantime the parties were quiescent until the successful issue of the system was fully developed and approved.

The commission was not the agent of the defendant, as claimed by appellant's counsel.   It was not the agent of either party.   Its approval of the system was essential, and the plaintiff undertook to procure that approval, which was just as much a part of the obligations assumed as the erection of the device.

The reports of the engineer of the commission may not establish the facts contained in them.   No matter.   The crux of the difficulty is that the plaintiff has failed to procure the sanction of the commission to the use of the device, and has not shown any satisfactory reason for this omission.

We think there was no question of fact to submit to the jury.   The judgment should be affirmed, with costs.

Judgment and order affirmed, with costs.   All concur, except ROBSON, J., who dissents.

---

## SPECK v. INTERNATIONAL RY. CO.

(Supreme Court, Appellate Division, Fourth Department.  July 6, 1909.)

1. CARRIERS (§ 303*)—SETTING DOWN PASSENGERS—DUTY OF STREET RAILROADS.
    In undertaking to land passengers, some obligation rests on a street railroad company to afford a reasonably safe place for them to alight and a reasonable opportunity to do so in safety.

    [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1216, 1218, 1224–1243; Dec. Dig. § 303.*]

2. CARRIERS (§ 303*)—SETTING DOWN PASSENGERS—DUTY OF STREET RAILROADS.
    While the duty of a street railroad company to keep each stopping place where there are no street intersections free of ice and the snow leveled down exists, it must be a relative one, taking into consideration the weather on the one hand and the safety of passengers on the other.

    [Ed. Note.—For other cases, see Carriers, Cent. Dig. § 1231; Dec. Dig. § 303.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. CARRIERS (§ 320*)—SETTING DOWN PASSENGERS—SAFETY OF STOPPING PLACE
    —QUESTION FOR JURY.

    In an action for injuries to a street car passenger in alighting from
a car, evidence *held* to present a question for the jury as to whether the
stopping place was reasonably safe, as plaintiff was assured by the con-
ductor.

    [Ed. Note.—For other cases, see Carriers, Cent. Dig. § 1244; Dec. Dig.
§ 320.*]

4. WITNESSES (§ 219*)—PRIVILEGE OF COMMUNICATION TO PHYSICIAN—WAIVER
    THEREOF.

    In an action for personal injuries, the act of plaintiff in calling her
family physician to testify to her condition constituted a waiver of the
privilege as to professional information of a physician, within the pur-
view of Code Civ. Proc. § 836, as amended by Laws 1899, p. 69, c. 53,
providing for the admission of such disclosures when expressly waived
on the trial in open court.

    [Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 781, 782; Dec.
Dig. § 219.*]

Appeal from Trial Term, Niagara County.

Action by Mary A. Speck against the International Railway Com-
pany. From a jugment for plaintiff, and from an order denying a new
trial, defendant appeals. Reversed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS,
KRUSE, and ROBSON, JJ.

Morris Cohn, for appellant.
Augustus Thibaudeau, for respondent.

SPRING, J. The plaintiff, a married lady of the age of 63 years,
claims to have been injured by reason of the negligence of the de-
fendant while alighting from one of its cars. The defendant operates
a double-track street-surface road along the center of River Road from
Buffalo to Niagara Falls. The respondent resides on the south side of
this road in the village of La Salle. Although the land is used for
farming purposes, it is quite thickly settled. In the forenoon of March
13, 1905, the plaintiff went to Niagara Falls on one of defendant's cars,
accompanied by a married daughter, who resided near her. They re-
mained in Niagara Falls until shortly after noon, taking the 12:30 car
homeward, making the run in 14 minutes. There was a regular stop-
ping place for the defendant's cars at Shearer's, a short distance east
of where the plaintiff resided; and the car stopped at that point to
enable the plaintiff to alight, which she did on the south side of the
car. She had several packages, which the conductor held until she
had stepped off the car. Immediately after she got off, she slipped
and fell, striking her knee against the step of the car, resulting, as she
claims, in serious injury. The plaintiff and her daughter testified
that the conductor told her, as the car stopped, "it was all safe to
get off."

There was a heavy body of snow on the ground at the time of the
accident to the plaintiff, which had been increasing since about the
1st of February. The defendant frequently ran a rotary snow plow
along the tracks, throwing the snow to the north side of the street,
which was between 50 and 60 feet in width. The snow on the north

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

side was several feet high. There was sufficient cleared space on this side of the track for sleighs, although the travel was chiefly along the track. The road on the south side of the tracks was little used. The only snow thrown on that side by the defendant was by a blade attached to the car to clean the rails of snow, and which projected 10 or 12 inches beyond the rail, and the snow deflected upward on that side. The alternating rain and freezing weather made this incline, and also the place immediately adjacent to the south rail, slippery and glary as ice. The place where the cars stopped for the accommodation of passengers was filled by this projecting blade with snow and ice, which was allowed to remain. The condition is thus described by one of the plaintiff's witnesses:

"There was a lot of snow on the south side of the track, beyond Shearer's stopping place, west. The stopping place was all right when the scrapers wasn't coming along. When they came along, they filled up the path again. Maybe they filled it up five or ten times a day."

The village street commissioner testified:

"I know where Mr. Shearer lives, and that there was a place there for cars to stop. I can't describe the highway in that place on the 13th day of March, 1905, because I can't remember. I should say the snow was in the neighborhood of 11 or 12 inches close to the track. Farther back it was about 3 or 4 or 5 feet higher. It ran in a slant toward the track. That runs on a slant. Where their little scraper comes up on the end of the car and cleans the rail, it leaves it on a kind of slant. I don't know just how deep these scrapers are. I should say 10 or 12 inches. The slant is towards the track. The River Road there is in the village of La Salle, and there are frequent stopping places there for people to get on and off these cars, and were before this accident. There are thickly populated streets—Hamilton street, the Bowen district, connecting with that riverway. Before the accident and up to that time there were a large number of people who lived in the village and worked or had business at Niagara Falls, and took these cars back and forth. At the point where the accident occurred the railway kept the highway in order."

The court charged the jury that:

"When the defendant undertook to land passengers at the place in question," it was bound "at all times to afford a reasonably safe place for her to alight from that car and a reasonable opportunity to alight from it in safety."

I think some obligation of this kind certainly rests upon the defendant. Dixon v. Brooklyn, C. & N. R. R. Co., 100 N. Y. 170, 3 N. E. 65; Flack v. Nassau Elec. R. R. Co., 41 App. Div. 399, 58 N. Y. Supp. 839. The burden may be an onerous one to lay on a street-surface road company running through a country district, where there is a heavy body of snow for a considerable period of time, changing to ice and crust, to keep each stopping place where there are no street intersections free of ice and the snow leveled down. The duty, while existing, must be a relative one, taking into consideration the weather conditions on the one hand and the safety of the passengers on the other. Each case must be dependent upon its own peculiar facts, to be determined by the jury. The defendant selects its stopping place, invites its passengers to take the car and alight at that particular point, and some assurance of safety must accompany this selection and invitation. The passenger has no choice. He must alight where the defendant directs. We cannot say as matter of law, in view of all

the circumstances, that this stopping place was reasonably safe for the plaintiff, as she was assured by the conductor.

The plaintiff claimed that the synovial membrane of the injured knee became inflamed and a permanent injury resulted. She did not consult any physician until May 2d, when Dr. Welsh, the family physisian, was called. Dr. Welsh, testifying in behalf of the plaintiff, attributed the synovitis to the injury and testified the condition might improve to some extent. The defendant claimed the injury was the result of chronic rheumatism, and evidence was presented tending in some degree to substantiate this claim. Dr. Horton, a witness on behalf of the defendant, testified that he examined and treated the defendant in May, 1905, and in consultation with Dr. Welsh, the attending physician. He was asked:

"State, Doctor, whether you found upon that examination any condition of the plaintiff which you can say with reasonable certainty resulted from any injury which she had received."

This was objected to as privileged, and the court inquired if the doctor was in consultation with plaintiff's physician, which was conceded, and the court excluded the testimony after the plaintiff's counsel declined to waive the privilege. The court, after ruling, remarked:

"He has got to waive it before you go any further with him, it being conceded that he learned what he did learn, and heard what he did hear, if anything, while he was acting in a professional capacity to this woman; and he should not voluntarily, whether he does or not, come here as a witness without the privilege being waived."

An exception was taken to the exclusion of this testimony. I think this ruling was error. In Morris v. Railroad Company, 148 N. Y. 88, 42 N. E. 410, 51 Am. St. Rep. 675, the action was to recover damages for personal injuries, and the plaintiff had been attended by two physicians, and one testified on the trial in her behalf. The defendant called the other physician for the purpose of showing the extent of the injuries claimed to be sustained by the plaintiff, but his evidence was excluded as privileged. The Court of Appeals reversed the judgment, holding that the plaintiff, by calling one of the physicians, removed the ban as to the other, and waived the privilege inuring to her benefit by the statute.

That case is decisive of the present one, unless the amendments to the Code provisions have nullified its effect. After this decision, section 836 of the Code of Civil Procedure was amended by chapter 53, p. 69, of the Laws of 1899, which retained the prohibitory sections applicable, "unless the provisions thereof are expressly waived upon the trial * * * by the * * * patient," and which had been added to the statute by chapter 295, p. 580, of the Laws of 1893. The following limiting provision, however, was added: The waiver "provided for must be in open court." There were amendments (chapter 331, p. 874, Laws 1904, and chapter 331, p. 606, Laws 1905), neither of which change the statute of 1899 so far as it affects the present question.

Since the statute of 1899 became a law the subject has been passed upon by the Court of Appeals several times, and in each case the pa-

tient was held to have waived the privilege of the statute by herself opening the door and disclosing the condition, which, except for her disclosures, could not have been testified to. Clifford v. Denver & R. G. R. R. Co., 188 N. Y. 349, 80 N. E. 1094; People v. Bloom, 193 N. Y. 1, 85 N. E. 824, 18 L. R. A. (N. S.) 898; Capron v. Douglass, 193 N. Y. 11, 85 N. E. 827. In each of these cases there was no express waiver by word of mouth in open court; but the act of the plaintiff by a proceeding in court was deemed to constitute a waiver, within the purview of section 836 of the Code of Civil Procedure.

For this error I think the judgment should be reversed.

Judgment and order reversed, and new trial granted, with costs to appellant to abide event. All concur for reversal.

McLENNAN, P. J., and WILLIAMS, J., vote for reversal on the additional ground that no actionable negligence of the defendant was shown.